## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

UNITED STATES OF AMERICA,    )     Criminal Action No.: 5:15-cr-00029

v.

FELIX ADRIANO CHUJOY, *et al.*,    )     **By: Hon. Michael F. Urbanski**
    **United State District Judge**

Defendants.

### MEMORANDUM OPINION

On December 22, 2015, a jury found defendants Felix Adriano Chujoy and Carolyn J. Edlind guilty of conspiracy to engage in witness tampering under 18 U.S.C. § 1512(k) (Count One), witness tampering under 18 U.S.C. § 1512(b)(1) (Count Two), and obstruction of justice under 18 U.S.C. § 1503 (Count Three). The jury also found Edlind guilty of perjury under 18 U.S.C. § 1623 (Count Four), and a second count of obstruction (Count Five). The final two counts concern Edlind's testimony before the grand jury on October 6, 2015.

Before the court is defendants' joint motion for acquittal, ECF No. 113.[1] Edlind and Chujoy argue insufficiency of the evidence and claim no reasonable juror could convict on any count. They also claim plain error in the court's jury instructions. The government disagrees and urges the court to affirm the guilty verdicts.

After careful review of the trial record and the arguments of counsel, the court concludes that the government submitted sufficient evidence for a reasonable juror to find

---

[1] Defendants also filed a joint motion for new trial, ECF No. 127, which the court will address in a separate memorandum opinion.

Edlind and Chujoy guilty of conspiracy, witness tampering, and obstruction as charged in Counts One, Two and Three. However, the court does not find that any of the six alleged false statements in Count Four support Edlind's perjury conviction. The court likewise finds the evidence insufficient to convict Edlind of obstruction as charged in Count Five. Accordingly, the joint motion for acquittal, ECF No. 113, is **GRANTED in part and DENIED in part**. The defendants' convictions on Counts One, Two, and Three are affirmed. Edlind's convictions on Counts Four and Five are vacated, and a judgment of acquittal will be entered on these counts.

## I.

The current indictment relates to another criminal case pending before this court: <u>United States v. Maria Rosalba Alvarado McTague, et al.</u>, No. 5:14-CR-055 (filed Dec. 4, 2014) [hereinafter the "Inca's Secret case"]. The government alleges that Chujoy and Edlind contacted Michael Kwiatkowski, a witness in the Inca's Secret case, between March 2015 and June 2015 in an attempt to influence his testimony during trial. The government further alleges that Edlind lied about her communications with Chujoy and Kwiatkowski when she was questioned before the grand jury. The relevant facts are outlined below.

### A. Investigation of Inca's Secret Restaurant

On or about July 2014, the Department of Homeland Security began investigating the legal status of workers at the Inca's Secret Restaurant in Harrisonburg, Virginia. Trial Tr., Dec. 16, 2015, ECF No. 109, 4:16–6:22 ("12/16 Trial Tr."). Chujoy and his mother Maria Rosalba Alvarado McTague ("Alvarado") were targets of that investigation. <u>Id.</u> In December 2014, Chujoy and Alvarado were indicted on various federal charges, arrested,

2

and released on bond. Id. at 27:8–29:23; 36:21–37:4.[2] As a condition of bond, Chujoy and

Alvarado were to avoid all contact with potential witnesses in the Inca's Secret case. Id. at

36:8–38:13; Gov't Exs. 3, 4. Notably, Alvarado was released into the third-party custody of

Edlind and her husband, Gary Edlind. 12/16 Trial Tr. 37:23–38:13. The Edlinds were close

friends with Chujoy, and Carolyn Edlind was often described as Chujoy's "tia" or "aunt."

See, e.g., Trial Tr., Dec. 18, 2015, ECF No. 111, 74:3–4 ("12/18 Trial Tr.").[3]

In early 2015, the government discovered evidence that Chujoy, Alvarado, and

Chujoy's sister, Gladys Chujoy, were contacting witnesses in the Inca's Secret case. 12/16

Trial Tr. 8:18–23; 40:4–23. Agent Tami Ketcham of the Department of Homeland Security

obtained cell phone records for these witnesses, and discovered they received multiple calls

from phones associated with Alvarado, Gladys Chujoy, and several known associates of

Chujoy. Id. at 9:2–25:25; Gov't Exs. 6–11; 13–25. No calls were discovered from Chujoy's

personal phone. However, federal agents interviewed Chujoy's known associates—

including Edlind and Kwiatkowski—and learned that Chujoy had made calls from their

phones on various occasions. 12/16 Trial Tr. 64:7–68:18; Trial Tr., Dec. 17, 2015, ECF No.

110, 113:3–114:10; 177:21–23; 206:9–12 ("12/17 Trial Tr."); 12/18 Trial Tr. 42:12–43:13;

75:12–76:15.

---

[2] The jury did not hear details on the specific charges alleged in the Inca's Secret indictment, but did hear testimony that the case was "generally about workers at Inca's Secret," 12/18 Trial Tr. 78:22–79:2, and that Chujoy and his mother had been charged with "traffick[ing] people from Peru" and "pay[ing] them way below minimum wage." Gov't Ex. 83.

[3] The government offered other evidence about the close relationship between Edlind and Chujoy. For example, Edlind was seen waving and blowing kisses to someone in the Rockingham County Regional Jail during the time Chujoy was imprisoned there. 12/16 Trial Tr. 55:7–56:6. She also visited him in the jail at least nine times between April 2015 and June 2015. Gov't Ex. 35.

Acting on evidence that Chujoy, Alvarado, and Gladys Chujoy had contacted potential witnesses, the grand jury returned a superseding indictment in the Inca's Secret case in March 2015. 12/16 Trial Tr. 40:24–41:20.[4] This superseding indictment alleged charges of obstruction and witness tampering against all three defendants. Id. Chujoy was re-arrested on March 18, 2015, at Edlind's residence in Harrisonburg, Virginia. Id. at 52:9–53:15. The court thereafter detained Chujoy at the Rockingham County Regional Jail. Id. at 42:10–12. Trial on the superseding indictment in the Inca's Secret case was set for June 22, 2015. Id. at 42:16–20.

## B. Witness Tampering of Kwiatkowski

After his re-arrest in March 2015, Chujoy continued to contact friends and family from prison. In particular, Chujoy made multiple attempts to speak with Kwiatkowski or have others, including Edlind, speak with Kwiatkowski on his behalf. Kwiatkowski had a "close" friendship with Chujoy for at least six years, which intensified after Kwiatkowski returned to Harrisonburg in 2013. 12/18 Trial Tr. 72:1–73:8. The two men socialized with several mutual friends, including Edlind. Id. at 72:1–74:7. This friendship made Kwiatkowski a potential witness in the Inca's Secret case. For example, Chujoy told Kwiatkowski that employees at the Inca's Secret Restaurant were undocumented aliens. Id. at 77:21–78:21.[5] Further, Kwiatkowski's cell phone was used to contact other witnesses in

---

[4] As with the initial indictment in the Inca's Secret case, the jury did not hear evidence about the specific charges alleged in the superseding indictment. However, the jury did hear evidence that the superseding indictment was the result of Agent Ketcham's investigation into phone calls between Chujoy and witnesses in the Inca's Secret case.

[5] Kwiatkowski testified that, at the time, he "didn't believe it" and thought Chujoy was "joking" when Chujoy told him that employees at Inca's Secret were undocumented. 12/18 Trial Tr. 78:4–79:2.

4

the Inca's Secret case, and Kwiatkowski could testify that Chujoy borrowed his phone on several occasions. Id. at 75:12–76:14.

As part of her investigation in the Inca's Secret case, Agent Ketcham interviewed Kwiatkowski in May 2015. 12/16 Trial Tr. 67:9–13. Kwiatkowski provided a witness statement that was disclosed to Chujoy's defense counsel. Id. He was also subpoenaed to testify during trial of the Inca's Secret case. 12/16 Trial Tr. 26:22–27:3.

### 1. "Taco Tuesday" Dinners

The first relevant contact between Chujoy, Kwiatkowski, and Edlind came in late 2014. After Chujoy's first arrest in the Inca's Secret case, he attended several dinners with Edlind, her husband Gary Edlind, Kwiatkowski, and a friend named Christina Kang. The majority of these dinners took place on "Taco Tuesdays" at the El Charro Restaurant in Harrisonburg. 12/17 Trial Tr. 179:9–180:14; 12/18 Trial Tr. 82:11–83:14. During this period—which stretched from December 2014 to March 2015—Kwiatkowski, Edlind, and Kang were some of Chujoy's closest friends and provided him with "emotional support." 12/18 Trial Tr. 116:22–118:5.

After Chujoy was re-arrested on March 18, 2015, Edlind continued to organize "Taco Tuesdays" dinners with Kwiatkowski, Kang, and her husband to discuss Chujoy and his legal situation. Notably, Edlind asked Kang and Kwiatkowski to turn their cell phones off or leave them in the car during these dinners because Edlind believed the "government" could listen to their conversations. 12/17 Trial Tr. 184:2–6. Kang testified that this request made her feel "very uncomfortable" and like she "had to hide something." Id. at 184:2–11.

5

The dinners with Edlind, Kwiatkowski, and Kang were sporadic, and occurred approximately once every two or three weeks from late March 2015 until June 2015. 12/17 Trial Tr. 180:7–185:21; 12/18 Trial Tr. 82:11–84:4; 87:16–88:20. During these meetings, Edlind, Kwiatkowski, and Kang discussed their "reactions" to Chujoy's ongoing prosecution, 12/17 Trial Tr. 183:11–22, and Edlind offered updates on Chujoy's condition in prison. 12/18 Trial Tr. 81:20–82:7. Edlind also asked Kwiatkowski to visit Chujoy at the Rockingham County Regional Jail. Id. At one dinner, Edlind and her husband asked Kwiatkowski about his interviews with federal agents. Id. at 94:3–12. Kwiatkowski "brush[ed] off" these questions because he "didn't want to tell them that [he had spoken with law enforcement] because then [he] figured they'd ask [him] . . . what [he] said or something like that." Id.

### 2. Dinner at Edlind's Home in March 2015

In addition to the Taco Tuesday dinners, Edlind hosted at least one dinner for Kwiatkowski and Kang at her home in Harrisonburg. This dinner occurred on or about March 25, 2015, only a few weeks after Chujoy was re-arrested on the superseding indictment in the Inca's Secret case. 12/17 Trial Tr. 180:15–182:9; 12/18 Trial Tr. 84:5–85:1.[6] At this time, Edlind was "obsessing" about Chujoy's case and was worried about the charges pending against him. 12/18 Trial Tr. 128:11–25. During the dinner, Edlind "bash[ed]" Chujoy and disclosed things about him that Kwiatkowski and Kang had not known. Id. at 85:9–21. Further, Edlind and her husband told Kwiatkowski and Kang that if

---

[6] Kang and Kwiatkowski gave conflicting dates for the dinner at Edlind's home. Kang was certain the dinner took place on March 25, 2015. 12/17 Trial Tr. 180:15–182:9. Kwiatkowski estimated the dinner at Edlind's home took place approximately two weeks after he returned home from an international trip on March 24, 2015. 12/18 Trial Tr. 84:5–85:1.

6

federal agents tried to contact them, they should say that they "d[id]n't know anything because [they] d[id]n't know anything." Id. Kwiatkowski was "kind of shocked" by this statement and found it "strange." Id. at 85:24–86:22. As Kwiatkowski explained at trial:

> I felt [the dinner] was really strange . . . and I didn't understand it because I thought it was just going to be a meal about, like, reminiscing [about Chujoy], not finding out stuff that we didn't know about him and then the last part where they were, like, you don't - - just say you don't know anything.

Id. at 87:10–15. However, Kwiatkowski admitted that, at the time, he did not believe he knew anything relevant to the Inca's Secret case, did not feel threatened or intimidated by the Edlinds, did not tell the Edlinds he felt uncomfortable, and continued to attend Taco Tuesday dinners with them. Id. at 129:7–130:12.

### 3. Jail-House Phone Calls in April and May 2015

After being re-arrested in March 2015, Chujoy tried to contact various individuals—including Kwiatkowski—from the Rockingham County Regional Jail. Chujoy used his inmate PIN number to place telephone calls to Edlind, Kwiatkowski, and three other individuals. 12/16 Trial Tr. 70:4–71:19; 12/17 Trial Tr. 9:17–25. Jail officials track phone calls using an inmate's PIN number, which allows deputies to identify which inmate placed a specific outgoing call. 12/17 Trial Tr. 148:23–149:12. Of the five people Chujoy contacted via phone, several, including Edlind and Kwiatkowski, were individuals whose numbers had previously appeared in the call records of witnesses in the Inca's Secret case. 12/17 Trial Tr. 10:1–11:15.

At trial, the government introduced recordings of eight phone calls Chujoy made using his inmate PIN number. Gov't Exs. 37–54. The first call was to Kwiatkowski on

7

March 31, 2015. Gov't Exs. 37–38. In that call, Chujoy briefly asked Kwiatkowski to visit him at the jail. Gov't Ex. 38. Kwiatkowski testified that Chujoy also called him on several other occasions to encourage him to visit the jail. 12/18 Trial Tr. 79:17–82:9. Recordings of those calls were not introduced at trial.

The other seven recorded phone calls were to Edlind, and took place between April 5, 2015 and May 1, 2015. Gov't Exs. 41–54.[7] In each, Chujoy asked Edlind if she has talked to Kwiatkowski, tells Edlind to encourage Kwiatkowski to visit him in the jail, and confirms that Kwiatkowski is on his visitation list. Gov't Exs. 41–54. Kwiatkowski never visited Chujoy because he "didn't really want to be a part of this" and "didn't want to visit him." 12/18 Trial Tr. 81:15–19. However, Kwiatkowski testified that Edlind reminded him on multiple occasions that he was on Chujoy's visitation list, and asked him if he was going to visit Chujoy in jail. Id. at 79:17–82:9.

### 4. Chujoy Receives Kwiatkowski's Witness Statement in June 2015

On or about June 2, 2015, Chujoy met with his defense counsel to prepare for trial in the Inca's Secret case, then scheduled to begin on June 22, 2015. During this meeting, Chujoy was given a copy of Kwiatkowski's interview with federal investigators. Gov't Ex. 28.2. Chujoy was disturbed by Kwiatkowski's statements; he stated in a letter sent to Edlind on June 3, 2015 that he was "pretty shocked" by Kwiatkowski's interview and that he hoped "it [was] either a big misunderstanding or that the feds are twisting it around." Id. Indeed, Chujoy's receipt of Kwiatkowski's interview set off a flurry of activity as described below.

---

[7] The transcripts of these seven calls inconsistently identify Edlind as the person who received the call. Some transcripts make it clear that Edlind was the receiver. See Gov't Ex. 54. Others only state that a "female" was the receiver. See, e.g., Gov't Ex. 42. However, this inconsistency went unchallenged at trial, and neither defendant has argued that the "female" referenced in the transcripts is anyone other than Edlind.

### 5. Jail-House Phone Calls in June 2015

At some point, Chujoy began using PIN numbers from other inmates to make phone calls. Using another inmate's PIN number makes it more difficult to track jail phone calls, since calls made using another inmate's PIN number are logged to the owner's account, not the account of the inmate placing the call. 12/17 Trial Tr. 148:23–149:12. The government offered evidence that Chujoy knew his jail phone calls were being recorded, and that Chujoy's jail commissary balance—from which the cost of phone calls are deducted—showed a positive balance on days when Chujoy placed phone calls using PIN numbers from other inmates. Id. at 37:4–40:19; Gov't Exs. 28.1, 33.

In total, the government obtained eleven calls Chujoy made using another inmate's PIN numbers. 12/17 Trial Tr. at 24:19–26:9. Of these eleven calls, ten were made to Donald Smith, Chujoy's friend and then-deputy sheriff in Augusta County, Virginia. Id. at 24:19–26:9. Smith was also a witness in the Inca's Secret case. Like Kwiatkowski, Smith loaned his cell phone to Chujoy on multiple occasions, and Smith's cell phone number was discovered in the call records of witnesses in the Inca's Secret case. 12/17 Trial Tr. 29:24–30:20.

The government offered recordings from four of these calls, which were placed between May 29, 2015, and June 14, 2015. Gov't Exs. 56.1–63. In the first call from May 29, Chujoy and Smith briefly discussed Smith's previous interview with law enforcement about the Inca's Secret case. Gov't Ex. 57. During the second call—which occurred on June 2—Chujoy told Smith that "Mike" was the reason federal agents had interviewed Smith

9

and encouraged Smith to contact "Mike." Gov't Ex. 59. Subsequent evidence made it clear that "Mike" was Michael Kwiatkowski.

The third call came two days later, on June 5, 2015. Gov't Ex. 61. Chujoy discussed Kwiatkowski's interview with federal agents, including statements Kwiatkowski made about Chujoy's ownership of a home in Harrisonburg and Alvarado's ownership of other homes abroad. Gov't Ex. 60.1 3:15–4:02. Chujoy was concerned Kwiatkowski was mistaken about the ownership of these homes. Id. Specifically, the following exchange occurred on the June 5 call:

* * * *

> Chujoy: The problem, the problem is, that a lot of you know – I, I think [Kwiatkowski] doesn't understand the fact that, you know, how I would always be joking with him?
>
> Smith: Yeah.
>
> Chujoy: And then he would take it seriously?
>
> Smith: Yeah.
>
> Chujoy: And everybody knew it that it was just a joke but him? That's where a lot of the confusion comes, because like he . . . so just clarify that, because I mean well some of it is just crazy, you know?
>
> Smith: Well, I don't want to go to talk to Mike, if Mike's gonna just tell them a bunch of bullshit, and it's gonna bother you. I mean it's gonna hurt . . . I don't wanna do that.
>
> Chujoy: I know, but I think . . . that he, he needs to realize that fact that . . . that I don't know if he realizes the fact that there was a lot of . . . like, I don't think he understands the miscommunication there was because of the fact that he wouldn't understand when things were a joke and when things weren't a joke, you know?
>
> Smith: Yeah.

* * * *

Chujoy: But yeah, if you could try clarifying that with him it'll be good or or getting him to, to, to come by, come into town or something, you know?

Smith: Who you talkin' about, Mike?

Chujoy: Uh huh.

Smith: Well, I don't know when I ever see Mike and I don't really, you know, I can try to talk to him, but I don't really want to say, you know, I don't really want to say anything to him that, you know, where they'll come after me saying I tried to, you know, change his testimony I mean I don't want to –

Chujoy: Okay, never mind then.

Smith: You know, I don't want to –

Chujoy: Okay, it's no big deal then.

Smith: But I'll, I'll do what I can.

Gov't Ex. 61. At trial, Smith testified that he never spoke with Kwiatkowski and stated that "pressur[ing]" Kwiatkowski would be "against the law." 12/17 Trial Tr. 219:15–22; 223:2–224:17. However, Smith also believed Chujoy was trying to get Kwiatkowski to tell the truth about the ownership of these homes. Id. at 244:22–245:9.

Finally, Chujoy told Smith on the June 5 call that he had sent Smith a letter about Kwiatkowski, and asked if Smith had received it. Gov't Ex. 61. Smith told Chujoy that he had not, and stated he had also not spoken with Kwiatkowski. Id. Chujoy told Smith the letter should arrive "today or tomorrow." Id. He also asked Smith to speak with his "aunt"—which Smith understood to be Edlind—because Chujoy had written her a letter with "more details." Id.; see also 12/17 Trial Tr. 218:19–25. Smith never contacted Edlind about Chujoy's letters because Smith "didn't have time." 12/17 Trial Tr. 219:1–5.

11

A fourth call between Chujoy and Smith occurred on June 14, 2015. Gov't Ex. 63. Chujoy again asked if Smith had received his letter about Kwiatkowski, and Smith said he had not. Id.[8] Chujoy also told Smith to "remember" that Chujoy had previously borrowed cell phones from other people because he had a "crappy phone" that he "could barely hear." Id.

### 6. Letter from Chujoy to Edlind Dated June 3, 2015

Chujoy also maintained a steady contact with Edlind from jail. In addition to jail phone calls, Edlind visited Chujoy in the jail at least nine times between April and June 2015. Gov't Ex. 35. Chujoy also wrote several letters to Edlind. Of particular importance is a letter dated June 3, 2015. In the June 3 letter, Chujoy described Kwiatkowski's interview with federal agents and asked Edlind to contact Kwiatkowski. The letter stated:

> I'm going to keep this very short in hopes that it reaches you by or before Saturday. I met w[ith] my attorney yesterday [and] he read me Mike Kwiatkowski's interview w[ith] the feds. I'm pretty shocked by what it says, so I'm hoping that is either a big misunderstanding or that the feds are twisting it around. The interview says that according to Mike, my mom was very intimidating, that I can't be trusted, and that I'm always lying and making up stories. It goes on into more specific stories and examples that made me laugh, as I realized that Mike really is as dumb as a door knob, as he obviously could not understand/differentiate when I was joking and when I was being serious. His entire testimony/interview reminded me of a big misunderstanding that we (Mike, Christina [Kang] & I) had over a joke, when I told Christina that he was mildly retarded.
>
> Please make sure to meet with both of them so that Mike understands that much of the information he gave out is incorrect and could lead into me getting into a huge problem. Be nice to him about it, as I wouldn't want to offend him or

---

[8] In his trial testimony, Smith confirmed that he never received any letter about Kwiatkowski, though he did receive other letters from Chujoy prior to June 5, 2015. 12/17 Trial Tr. 217:17–218:12.

have him take things personal. I understand that my jokes are sometimes stupid [and] between that [and] him not being able to tell when I was joking or not, his comments/interview are ludicrous.

I hope you get to meet w[ith] them ASAP, as clarifying all this is pretty crucial.

\* \* \* \*

P.S. He should probably also clarify that we didn't really start hanging out until half way through 2014, as that would probably explain why we were always on two different pages [and] why he didn't really know much about me, or why he couldn't tell when I was joking.

Gov't Ex. 28.2 (emphasis in original). This letter was dated two days before Chujoy's June 5 phone call to Smith, in which Chujoy also asked Smith to speak with Kwiatkowski. Gov't Exs. 60.1, 61.

After receiving the June 3 letter, Edlind reached out to Kwiatkowski. First, Edlind contacted Kwiatkowski by phone—though Kwiatkowski could not recall the exact date of this phone call—and stated that Chujoy had written Kwiatkowski a letter. 12/18 Trial Tr. 96:5–97:8. However, Edlind refused to read the letter to Kwiatkowski or describe its contents. Id. Instead, she encouraged Kwiatkowski to pick the letter up in person. Id.

On June 6, 2015—three days after Chujoy wrote Edlind—Edlind visited Chujoy in the Rockingham County Regional Jail. Gov't Ex. 35. A few hours later, Edlind sent Kwiatkowski and Kang a text message to arrange a meeting. Gov't Ex. 30. In her initial text message, Edlind stated that it was "very important we meet this week!!!! please [sic] contact me if you can't do Tuesday" and hinted that there was "serious stuff to discuss." Id. Kang replied that she would prefer to speak via phone, and Kwiatkowski stated that he "probably shouldn't be talking about" things that could not be discussed via phone. Id. In response,

13

Edlind stated "not on the phone you know why" and "the phones are bugged you know that enslave [sic] the phones in the car will be fine like we have in the past." Id. Edlind's final text stated that "you guys opt out I'll tell Felix don't worry about it I don't need to stress either." Id.

Despite his reservations, Kwiatkowski made plans to meet with Edlind on June 16, 2015 at the El Charro Restaurant. Gov't Ex. 31. This meeting was six days before Chujoy's June 22 trial in the Inca's Secret case. Kang did not respond further to Edlind's June 6 text message, and did not attend the subsequent dinner meeting. Kang testified that Edlind's message made her feel "uncomfortable" and "like we were being put in a situation where we had to be secretive about things that were either allowed to be discussed or weren't, but the fact that we had to put out phones in the car, there's this feeling of secrecy that I felt uncomfortable participating in . . . I didn't want to go." 12/17 Trial Tr. 189:20–190:14.

### 7. Dinner at El Charro on June 16, 2015

Prior to June 16, Kwiatkowski told federal agents about Edlind's text message and agreed to wear a recording device to the El Charro dinner. 12/18 Trial Tr. 98:13–100:24. The government introduced a full recording of the dinner, as well as various excerpts. Gov't Exs. 66–92. Three people attended the June 16 dinner: Edlind, her husband Gary Edlind, and Kwiatkowski. 12/18 Trial Tr. 101:16–17. As Kwiatkowski arrived, Edlind told him to sit on his phone or leave it outside. 12/18 Trial Tr. 101:19–24. Kwiatkowski complied, and left his phone outside. Id. at 102:7–10.

The Edlinds and Kwiatkowski then engaged in a somewhat meandering conversation that lasted approximately an hour. See Gov't Ex. 92. At first, Edlind said that Chujoy had

14

written Kwiatkowski a letter telling him "not to say anything, don't write him, or do nothing." Gov't Ex. 69. Edlind later clarified that Chujoy did not write a letter to Kwiatkowski, but rather wrote a letter to Edlind instructing her to tell Kwiatkowski "not to mention anything about that and don't contact because . . . [t]hey're reading the mail." Gov't Ex. 75. It is not clear from the transcript just what Chujoy wanted Edlind to tell Kwiatkowski not to mention.

Both Edlind and her husband also discussed facts relevant to the Inca's Secret case, including that Chujoy and Alvarado had used friends' cell phones to contact witnesses, and that Edlind thought some of the charges had been a set-up. Gov't Exs. 77, 79, 81, 87, 89. At one point, Edlind corrected Kwiatkowski when he stated that Chujoy was a manager at Inca's Secret, stating that Chujoy was only a "volunteer" at the restaurant. Gov't Ex. 83. Edlind then described how hard it was to tell when Chujoy was joking, called both Alvarado and Chujoy liars, and stated that "you can tell them nothing." Gov't Ex. 85.

At the conclusion of the meeting, Edlind told Kwiatkowski that he did not need to meet with prosecutors if they offered to speak with him before trial. Gov't Ex. 91. However, Edlind encouraged Kwiatkowski to abide by his trial subpoena and assured him that he was not a target of the pending prosecution. Gov't Ex. 92 43:05–49:10. Both Edlinds also told Kwiatkowski to "tell the truth" and to not worry if his testimony was damaging to Chujoy. Id. at 45:25–46:20; 12/18 Trial Tr. 137:2–12. Kwiatkowski testified that he did not believe the Edlinds were attempting to "trick" or "mislead" him during the dinner on June 16, agreed that the Edlinds did not tell him what to say or what not to say in

court, and stated he did not feel threatened or intimidated by the Edlinds.  12/18 Trial Tr. 137:13–138:13.

### 8. Continuance of the Inca's Secret Trial

Following the June 16 dinner, the June 22 trial in the Inca's Secret case was continued for reasons unrelated to the instant case.  12/16 Trial Tr. 43:16–45:25.  After the continuance, Chujoy was re-released on bond and again ordered to have no contact with potential witnesses.  Id. at 46:1–25.  Despite this order, Chujoy exchanged text messages with Kwiatkowski between August 1, 2015 and August 29, 2015.  Gov't Ex. 32.  In these messages, Chujoy invited Kwiatkowski to join him at multiple social events.  See id. Kwiatkowski responded several times, but did not meet with Chujoy in person.  Id.  Finally, Kwiatkowski messaged Chujoy on August 29, saying that it was not "a good idea to be in contact until things settle down after the court date."  Id.  Chujoy responded that he "completely understood" and stated that "I haven't really texted you or anything though, at least not to my knowledge."  Id.  Kwiatkowski found this last response confusing because it was "obviously not true."  12/18 Trial Tr. 110:4–22.

Chujoy also contacted Smith and Kang after his release in late June.  While recovering several personal items from Smith, Chujoy mentioned again that Kwiatkowski had "said a bunch of stuff that wasn't true."  12/17 Trial Tr. 238:20–241:1.  However, Smith testified that he never "sat down and plotted anything with [Chujoy]" and stated that he never "talked to [Chujoy] about going and talking to Mike."  Id. at 239:22–240:4.  For her part, Kang told Chujoy it was "best" if they had no further contact.  Id. at 191:20–192:9.

16

## C. Edlind's Alleged Perjury on October 6, 2015

Following the continuance of the June 22 Inca's Secret trial, the government re-opened its investigation of witness tampering. As part of this new investigation, the government collected the prison calls Chujoy made to Edlind, Kwiatkowski, and Smith during his time in the Rockingham County Regional Jail. A new grand jury investigation followed, and Edlind was called to testify. On October 6, 2015, Edlind appeared before the grand jury and answered questions about her contact with Chujoy while he was in prison. During the course of this testimony, Edlind made multiple statements the government alleged to be false. Specifically, Edlind denied speaking with Kang and Kwiatkowski about the Inca's Secret case and denied receiving communications from Chujoy in which Chujoy asked her to speak with Kwiatkowski. The indictment in this case followed shortly thereafter.

## D. Trial of the Current Case and Post-Trial Motions

Trial in this case began on December 16, 2015. At the close of the government's evidence, defendants jointly moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The court reserved decision, and the trial continued. The defendants renewed their Rule 29 motion at the close of all the evidence. The court granted the motion in part, striking two of the false statements alleged in Count Four. Nevertheless, the court continued to reserve decision on all counts—including the six remaining false statements alleged in Count Four—and submitted the case to the jury. The jury returned a verdict finding both defendants guilty on Counts One, Two, and Three, and finding Edlind guilty on Counts Four and Five.

17

After the jury returned its verdict, defendants again renewed their Rule 29 motion. The court ordered them to submit written briefs, and set a deadline thirty days after filing of the trial transcript. Defendants timely filed a joint brief in support of their Rule 29 motion, ECF No. 113, and the court heard oral argument on May 11, 2016.

During argument, several issues were raised regarding Count Four, and the court ordered the government and Edlind to file supplemental briefs. These briefs were filed on June 1, 2016. Two days later, Edlind filed a Rule 33 motion. The court heard a second round of argument on July 20, 2016, during which Chujoy orally joined Edlind's motion for new trial. The timeliness of this Rule 33 motion is addressed in a separate memorandum opinion.

## II.

The court now turns to the merits of the joint motion for acquittal. Rule 29 of the Federal Rules of Criminal Procedure states that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The Rule further provides that a court can reserve decision on a motion for acquittal until after the jury returns a verdict or is otherwise discharged. Fed. R. Crim. P. 29(b). When, as here, the court reserves decision on a Rule 29 motion made at the close of the government's case, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).[9]

---

[9] Defendants urge the court to consider all the evidence presented at trial when ruling on the motion for acquittal, noting that the court reserved decision on their Rule 29 motions at the close of the government's case, and again at the close of all the evidence. This court recently noted the confusion that results when a court takes a Rule 29 motion under advisement at multiple points during trial. United States v.

18

"There is only one ground for a motion for judgment of acquittal. This is that the evidence is insufficient to sustain a conviction of one or more of the offenses charged in the indictment or information." 2A Charles A. Wright, Federal Practice and Procedure: Criminal § 466 (4th ed. 2016) (internal citations omitted). "A judgment of acquittal based on the insufficiency of evidence is a ruling by the court that as a matter of law the government's evidence is insufficient 'to establish factual guilt' on the charges in the indictment." United States v. Alvarez, 351 F.3d 126, 129 (4th Cir. 2003) (quoting Smalis v. Pennsylvania, 476 U.S. 140, 144 (1986)). "The test for deciding a motion for a judgment of acquittal is whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." United States v. MacCloskey, 682 F.2d 468, 473 (4th Cir. 1982). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996). Accordingly, a court

Fowler, No. 5:14-CR-00058, 2016 WL 616317, at *9 (W.D. Va. Feb. 10, 2016). On similar facts, some courts confine their analysis to the evidence presented in the government's case-in-chief, while others consider the entire record. Id. (collecting cases). As in Fowler, the court sees no reason why it should ignore defendants' evidence if they believe it supports their motion for acquittal. It would be strange indeed if Rule 29(b)—a rule intended to prevent district courts from "penalizing" defendants by reserving decision on motions for acquittal—was applied to penalize a defendant whose argument for acquittal depends on evidence presented after the court took his Rule 29 motion under advisement. Cf. United States v. Gray, 405 F.3d 227, 237 (4th Cir. 2005) (describing the purpose of Rule 29(b)). Nevertheless, this court need not resolve this issue. Even if the court were to consider the evidence presented after the government rested its case-in-chief, it would still deny the defendants' Rule 29 motions on Counts One, Two, and Three. The defense evidence includes a variety of exhibits and testimony, focusing primarily on communications between Chujoy and Edlind and the June 16 dinner. Notably, Edlind took the stand to forcefully deny any intent to witness tamper or commit perjury. However, the jury, not the court, must weigh issues of credibility and resolve conflicts created by this evidence. See, e.g., United States v. Bonner, 735 F. Supp. 2d 405, 407 (M.D.N.C. 2010), aff'd, 648 F.3d 209 (4th Cir. 2011). To the extent defendants' evidence can be considered at this stage, it does not affect the court's analysis of Counts One, Two, and Three. Likewise, Edlind's convictions on Counts Four and Five fall regardless of any defense evidence.

must deny a defendant's motion if the evidence presented at trial, viewed in the light most favorable to the government, is sufficient for a rational juror to find each element of the offense beyond a reasonable doubt. United States v. United Med. & Surgical Supply Corp., 989 F.2d 1390, 1402 (4th Cir. 1993) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see also United States v. Friske, 640 F.3d 1288, 1290–91 (11th Cir. 2011) ("In reviewing a sufficiency of the evidence challenge, we consider the evidence in the light most favorable to the [g]overnment, drawing all reasonable inferences and credibility choices in the [g]overnment's favor.").

## A. Count Two: Witness Tampering

Counts One, Two, and Three involve various charges associated with defendants' alleged tampering of Kwiatkowski. Because the crux of defendants' argument deals with the allegations of witness tampering in Count Two, the court begins here. To prove witness tampering, the government must show: (1) that a defendant used intimidation, threats, corrupt persuasion, or misleading conduct against Kwiatkowski; (2) that the defendant acted knowingly; and (3) that the defendant acted with the intent to influence, delay, or prevent Kwiatkowski's testimony with respect to the Inca's Secret case. 18 U.S.C. § 1512(b)(1). The government need not show that defendants succeeded in influencing Kwiatkowski's testimony, only that they "act[ed] for the purpose of getting the witness to change, color, or shade his or her testimony in some way." Jury Instr., ECF No. 100, at 38.

### 1. Standard for Corrupt Persuasion and Misleading Conduct

The government concedes that the alleged witness tampering of Kwiatkowski was not done by threat or intimidation. Thus, the key issues are the meaning of "corrupt

20

persuasion" and "misleading conduct."[10] The term "misleading conduct" is defined by statute to include:

> knowingly making a false statement; intentionally omitting information from a statement and thereby causing a portion of such statement to be misleading, or intentionally concealing a material fact, and thereby creating a false impression by such statement; with intent to mislead, knowingly submitting or inviting reliance on a writing or recording that is false, forged, altered, or otherwise lacking in authenticity; with intent to mislead, knowingly submitting or inviting reliance on a sample, specimen, map, photograph, boundary mark, or other object that is misleading in a material respect; or knowingly using a trick, scheme, or device with intent to mislead;

18 U.S.C. § 1515 (a)(3)(A–E).  In contrast, the term "corrupt persuasion" is undefined—the statute notes only that this term "does not include conduct which would be misleading conduct but for a lack of state of mind."  Id. at § 1515(a)(6).  Faced with this unhelpful guidance, courts struggle to define the scope of corrupt persuasion.  At minimum, most courts—including the Fourth Circuit—conclude "that a non-coercive attempt to persuade a witness to lie to investigators constitutes a violation of § 1512(b)."  United States v. Baldridge, 559 F.3d 1126, 1142 (10th Cir. 2009) (citing, among others, the decision in United States v. Davis, 380 F.3d 183, 196 (4th Cir. 2004)).  However, courts are split on whether § 1512 outlaws mere attempts to persuade a witness to withhold information from law enforcement officials.  United States v. Khatami, 280 F.3d 907, 913 (9th Cir. 2002) (describing circuit split).  The Second and Eleventh Circuits hold that "corrupt persuasion" encompasses a broad range of persuasion—including efforts to encourage witnesses to withhold information—so long as a defendant is motivated by an "improper purpose."  See

---

[10] During post-trial arguments, both sides agreed that this case hinged on the issue of "corrupt persuasion," rather than "misleading conduct."  The court will focus its analysis accordingly.

21

United States v. Gotti, 459 F.3d 296, 342–43 (2d Cir. 2006) (finding that corrupt persuasion includes encouraging a co-conspirator to invoke his Fifth Amendment rights if the defendant was acting to ensure the co-conspirator did not implicate him in criminal activity); United States v. Shotts, 145 F.3d 1289, 1300–01 (11th Cir. 1998) (finding that corrupt persuasion includes attempts to persuade a witness to avoid talking with law enforcement); United States v. Thompson, 76 F.3d 442, 452 (2d Cir. 1996) (finding that corrupt persuasion includes efforts to persuade co-conspirators to conceal information and provide false testimony).

For their part, the Third and Ninth Circuits carve out exceptions for witnesses who have a legal right to avoid cooperating with law enforcement. Specifically, this second line of cases holds that a defendant does not run afoul of § 1512 if he encourages witnesses to invoke their Fifth Amendment rights or the marital privilege, even if the defendant intends to hinder a criminal investigation. United States v. Doss, 630 F.3d 1181, 1187–88 (9th Cir. 2011) (finding no corrupt persuasion where the defendant "appealed to his wife to exercise her marital privilege not to testify against him"); United States v. Farrell, 126 F.3d 484, 488 (3d Cir. 1997) (finding that corrupt persuasion does not include "a noncoercive attempt to persuade a co-conspirator who enjoys a Fifth Amendment right not to disclose self-incriminating information about the conspiracy to refrain, in accordance with that right, from volunteering information to investigators"). This second line of cases does not address whether the same behavior would qualify as corrupt persuasion when no privilege exists. See Farrell, 126 F.3d at 489 n.3 (noting that"[i]n the absence of a privilege, society has the right to the information of citizens regarding the commission of crime, and it can be argued

22

that discouraging another who possessed no privilege from honoring this civic duty involves

some culpability not present when coconspirators with Fifth Amendment privileges

converse").

To the court's knowledge, the Fourth Circuit has not yet addressed this circuit split.

However, the Supreme Court's decision in Arthur Andersen LLP v. United States, 544 U.S.

696 (2005), squarely addressed the issue of corrupt persuasion in § 1512. The Supreme

Court observed:

> [T]he act underlying [a] conviction [for § 1512]—
> "persuasion"—is by itself innocuous. Indeed, "persuad[ing]" a
> person "with intent to . . . cause" that person to "withhold"
> testimony or documents from a Government proceeding or
> Government official is not inherently malign. Consider, for
> instance, a mother who suggests to her son that he invoke his
> right against compelled self-incrimination, see U.S. Const.,
> Amdt. 5, or a wife who persuades her husband not to disclose
> marital confidences, see Trammel v. United States, 445 U.S. 40
> (1980).

Arthur Andersen, 544 U.S. at 703–04. Accordingly, the Supreme Court concluded that a

conviction under § 1512 required evidence that a "persuader [was] conscious of their

wrongdoing" such that they "knowingly . . . corruptly persuad[ed]." Id. at 705–06.

Unfortunately, the Supreme Court remanded the case without exploring the full scope of

corrupt persuasion in § 1512, holding instead that the trial court's jury instruction was so

infirm that it "diluted the meaning of 'corruptly' so that it covered innocent conduct." Id. at

706.

In light of Arthur Andersen, Chujoy proposed the following instruction on corrupt

persuasion:

23

> Merely persuading a person to withhold testimony in an official proceeding is not witness tampering or obstruction of justice. Persuasion is "corrupt" if the defendant acted knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice. Only persons conscious of wrongdoing can be said to knowingly corruptly persuade.
>
> The term "corrupt persuasion" does not include conduct which would be misleading conduct but for a lack of state of mind.

ECF No. 79, at 3. The government noted no opposition, ECF No. 85, at 2, and the jury was so instructed. Jury Instr., ECF No. 100, at 36.

### 2. The Evidence is Sufficient to Support a Conviction on Count Two

Having set the relevant legal framework, the court turns to the facts presented at trial. The government cites a slew of evidence to support Count Two, but its case boils down to two dinner conversations between Edlind and Kwiatkowski: (1) a dinner at Edlind's home on or about March 25, 2015 and (2) a dinner on June 16, 2015 at the El Charro Restaurant in Harrisonburg, Va. The government claims the circumstances surrounding these dinners and Edlind's behavior towards Kwiatkowski—done at Chujoy's behest—are sufficient to sustain a charge of witness tampering.

Standing alone, the March dinner is unconvincing. Edlind hosted this dinner in her home, inviting both Kwiatkowski and Kang. 12/17 Trial Tr. 180:15–182:9; 12/18 Trial Tr. 84:5–85:1. At some point, Edlind told Kwiatkowski and Kang they should say that they "d[id]n't know anything because [they] d[id]n't know anything" if federal agents contacted them about the Inca's Secret case. 12/18 Trial Tr. 85:10–86:22. Kwiatkowski found it "kind of shock[ing]" and "weird" that Edlind would tell him to "just say you don't know anything" if contacted by the police. Id. at 85:10–87:15. The government seizes on Edlind's statement

as evidence that the defendants tried as early as March 2015 to prevent Kwiatkowski from testifying against Chujoy. The court disagrees.

First, Chujoy had no role in the March dinner. At this point, he was imprisoned in the Rockingham County Regional Jail after his arrest on the superseding indictment in the Inca's Secret case. No evidence showed that he had any role in organizing this dinner, or otherwise encouraged Edlind to speak with Kwiatkowski. While Chujoy and Edlind had a long-standing friendship prior to his second arrest—including multiple dinners at which Chujoy's case was discussed—there is no evidence that Chujoy and Edlind formed a conspiracy to witness tamper as early as March 2015. At best, the government's evidence showed that any conspiracy began in April 2015, when Chujoy began calling Edlind to enlist her help in encouraging Kwiatkowski to visit him in prison. 12/18 Trial Tr. 81:20–82:7; Gov't Exs. 41–54. As a result, Edlind's statements at the March 25 dinner cannot be connected to Chujoy.

Moreover, assuming arguendo that Edlind's instruction to "say you don't know anything" was criminally culpable, there is no evidence Edlind knew in March 2015 that Kwiatkowski possessed information relevant to the Inca's Secret case. Even Kwiatkowski agreed that he did not believe he knew anything about Chujoy's ongoing prosecution at the time of the March dinner and did not consider himself a witness at that time. 12/18 Trial Tr. 128:11–129:16. Section 1512 requires evidence that Edlind "knowingly . . . corruptly persuad[ed]" Kwiatkowski and acted with the "specific intent to influence, delay, or prevent" Kwiatkowski's testimony in the Inca's Secret case. Absent evidence that Edlind knew—or even suspected— that Kwiatkowski had information relevant to Chujoy's prosecution, no

25

reasonable juror could conclude that Edlind's statements in March were made with "consciousness of wrongdoing," much less that she acted with the specific intent to influence Kwiatkowski's testimony.

This is not to say that the March dinner is irrelevant. While the March episode, standing alone, is insufficient to sustain a witness tampering conviction against Edlind, it remains a part of the mosaic of evidence presented by the government as to Edlind's intent; i.e. whether her efforts to influence Kwiatkowski's testimony were sufficiently corrupt. As such, it sets the stage for the events of June 2015.

By June 2015, the evidence established that Kwiatkowski had information relevant to the Inca's Secret case, causing Chujoy to reach out to Smith and Edlind about his testimony. Agent Ketchum testified that she interviewed Kwiatkowski on May 14, 2015, and turned over the notes of that meeting for disclosure to defense counsel. 12/17 Trial Tr. 53:16–55:10. Sometime in early June, Chujoy met with his counsel. During that meeting, Chujoy was read Kwiatkowski's interview with federal investigators. Gov't Ex. 28.2. Upset at Kwiatkowski's statements, Chujoy immediately contacted Edlind and Smith and asked them to meet with Kwiatkowski. Specifically, Chujoy placed multiple jail calls to Smith using another inmate's PIN number, effectively concealing these calls from authorities. 12/17 Trial Tr. 148:23–149:12; Gov't Exs. 56.1–63. In one call—placed on June 5, 2015—Chujoy told Smith about the statements Kwiatkowski made to federal agents. Gov't Ex. 61. Chujoy stated that Kwiatkowski did not "understand the fact that . . . I would always be joking with him" and asked Smith to "clarify" with Kwiatkowski that he did not "understand when things were a joke and when things weren't a joke." Gov't Ex. 61. Smith refused, telling

Chujoy that "I don't really want to say anything to [Kwiatkowski] . . . where they'll come after me saying I tried to, you know, change his testimony. . . ." Id.

Chujoy also wrote a letter to Edlind on June 3, raising concerns about Kwiatkowski's interview and the damage his statements might cause. Gov't Ex. 61. Chujoy wrote that Kwiatkowski "could not understand/differentiate when I was joking and when I was being serious" and asked Edlind to meet with Kwiatkowski and "clarify" things with him because he was giving out information that could get Chujoy "into a huge problem." Id. (emphasis in original).

Moreover, Chujoy's communication with Edlind—and Edlind's later conversation with Kwiatkowski—came mere weeks before the June 22 trial in the Inca's Secret case. The proximity of trial was reflected in the June 3 letter—Chujoy wrote Edlind that he "hop[ed] you get to meet w[ith] [Kwiatkowski and Kang] ASAP, as clarifying all this is pretty crucial." Gov't Ex. 28.2. Edlind's subsequent messages to Kwiatkowski were similarly urgent. First, Edlind called Kwiatkowski, telling him that Chujoy had written him a letter. 12/18 Trial Tr. 96:5–97:8. However, Edlind refused to read the letter to Kwiatkowski or describe its contents and instead asked him to pick the letter up in person. Id. Next, Edlind sent a text message to Kwiatkowski and Kang on June 6—three days after Chujoy's June 3 letter and a few hours after she met with Chujoy at the jail—telling them it was "very important we meet this week!!!! please contact me if you can't do Tuesday" and hinted that there was "serious stuff to discuss." Id. When pressed for details, Edlind refused to describe what she wanted to discuss, stating that "the phones are bugged." Id.

27

Kang ignored Edlind's request to meet because "there [was] this feeling of secrecy that I felt uncomfortable participating in . . . ." 12/17 Trial Tr. 189:20–190:14. For his part, Kwiatkowski told Edlind that he "probably shouldn't be talking about" things that could not be discussed via phone, Gov't Ex. 30, but ultimately agreed to meet with Edlind six days before Chujoy's trial. 12/18 Trial Tr. 98:13–100:24; Gov't Ex. 31. Taking this chain of evidence as a whole—and construing it in the light most favorable to the government—a reasonable juror could conclude that Chujoy enlisted Edlind to persuade Kwiatkowski to change his testimony prior to trial in the Inca's Secret case.

Thus, the central question is whether Edlind engaged in corrupt persuasion at the June 16 dinner as required by 18 U.S.C. § 1512(b)(1). Cf. Arthur Andersen, 544 U.S. at 703–04 (noting that § 1512 requires "corrupt persuasion" because mere persuasion is not "inherently malign"). The government points to the following excerpts from the June 16 dinner as evidence of corrupt persuasion:

- At two points, Edlind instructed Kwiatkowski not to say or know anything. First, after instructing Kwiatkowski to leave his phone outside, Edlind told Kwiatkowski that Chujoy wrote Kwiatkowski a letter, telling him "not to say anything, don't write him, or do nothing." Gov't Exs. 67, 69. Later in their conversation, Edlind clarified that Chujoy did not write a letter to Kwiatkowski, but rather wrote a letter to Edlind instructing her to tell Kwiatkowski "not to mention anything about that and don't contact because . . . [inaudible] watching everything. They just are. They're reading the mail." Gov't Ex. 75. Edlind did not specify what information Kwiatkowski was not supposed to mention, but this second statement came moments after Edlind asked Kwiatkowski if federal agents asked "about [Chujoy] murdering anybody" and after Edlind and Kwiatkowski vaguely referenced a child pornography sting operation. Gov't Exs. 71–73.

- Edlind also discussed facts relevant to the Inca's Secret case. For example, Edlind told Kwiatkowski that she believed Chujoy and Alvarado "may have contacted a witness" using her phone and the phones of others, Gov't Exs. 77, 79, 89, though she later claimed the case was a "setup" and that the

28

government may have "trapped" the defendants with the new witness tampering charges. Gov't Ex. 87. Edlind also expressed doubts about the government's case, noting that Alvarado made mistakes, but that "[b]asically, her mistakes [were that] she tried to run a business the way she would have in [Peru] you know. Run it loosely." Gov't Ex. 81. Finally, Edlind and her husband discussed the strength of Chujoy's defense, noting that they believed he never profited from the Inca's Secret Restaurant and never had any real leadership role in the business. Gov't Ex. 83. When Kwiatkowski mentioned that Chujoy was the manager of the Inca's Secret restaurant, Edlind responded that Chujoy managed the restaurant as a "volunteer," and suggested that Chujoy called himself a manager to boost his resume. Id.

- Edlind also commented on Chujoy's penchant for joking and lying. First, Edlind reminded Kwiatkowski about a time Chujoy "teased" Kwiatkowski about being "retarded." Gov't Ex. 71. Edlind claimed she told Chujoy "to stop doing that stuff" because "it's not funny." Id. Later, Edlind told Kwiatkowski that everyone in Chujoy's family "will lie," that lying "was [Chujoy's] sense of humor," and that "[t]hey've been lying so long . . . [i]t's an art form." Gov't Ex. 85. After Kwiatkowski recounted a prior conversation with Chujoy, Edlind responded that Chujoy had been "getting entertainment by [Kwiatkowski] being gullible" and stated that she had to remind Chujoy that "not everybody understands [his] sense of humor." Id.

- Finally, Edlind's closing comments discussed the upcoming trial. Edlind explained the trial strategy of defense counsel and told Kwiatkowski that he did not need to meet with prosecutors if they offered to speak with him before trial. Gov't Ex. 91.

Of particular concern are Edlind's instructions in the first excerpt. A reasonable juror could interpret Edlind's instruction "not to say anything" and "not to mention anything about that" as attempts to silence Kwiatkowski and persuade him to deny knowledge of certain facts. These statements parrot Chujoy's June 3 letter, in which he asked Edlind to "clarify" things with Kwiatkowski. Indeed, Edlind made it clear on June 16 that she was passing Kwiatkowski a message from Chujoy, explaining that it was Chujoy—via his letter—who wanted Kwiatkowski to avoid saying or mentioning certain things. Read

29

in context, a jury could properly view these remarks as an unstated or implied invitation to lie.

To be sure, there is some question about the precise facts Edlind and Chujoy wanted Kwiatkowski to deny. For example, Edlind's first statement was couched in general terms—she told Kwiatkowski "not to say anything, don't write him, or do nothing" without specifying what Kwiatkowski should avoid saying. Her second statement was also unspecific, telling Kwiatkowski "not to mention anything about that" without making clear what Kwiatkowski was to avoid saying. However, this second statement came moments after Edlind asked Kwiatkowski whether Chujoy had told him that he had murdered someone. Gov't Exs. 71–73. In fact, Edlind asked Kwiatkowski directly if federal agents wanted to know about this. Gov't Ex. 73. When Kwiatkowski said no, Edlind explained that "you see, [Chujoy] has nothing to do but sit in that jail cell and obsess." Id. Such context is sufficient for a reasonable juror to infer that Edlind—acting at Chujoy's direction—intended to corruptly persuade Kwiatkowski to deny knowledge of this past behavior even if questioned about it at trial.

In addition, the government offered evidence about other facts known to Kwiatkowski that Chujoy hoped to influence. For example, Chujoy complained to Smith during their June 5 phone call that Kwiatkowski told federal agents that Chujoy and his mother owned several homes both in Virginia and abroad. Similarly, Chujoy's June 3 letter gave examples of statements Chujoy wanted Edlind to "clarify" with Kwiatkowski, including Kwiatkowski's claim that Chujoy "couldn't be trusted" and "is always lying" and that Chujoy's mother was "very intimidating." Gov't Ex. 28.2. Chujoy also objected to certain

30

"specific stories and examples" Kwiatkowski shared with investigators. Id. While Chujoy did not elaborate on these "stories and examples" in his letter, the government offered evidence about Kwiatkowski's knowledge of the Inca's Secret case. For example, Chujoy told Kwiatkowski on one occasion that employees at the Inca's Secret Restaurant were undocumented aliens. 12/18 Trial Tr. 77:21–78:21. Further, Kwiatkowski's cell phone was used to contact other witnesses in the Inca's Secret case, and Kwiatkowski could testify that Chujoy used that phone to make multiple calls in the months after Chujoy's December arrest. Id. at 75:12–76:14. This information is highly relevant to the charges in the Inca's Secret case, and a reasonable juror could infer that these were the "specific stories and examples" mentioned in Chujoy's June 3 letter, and that Edlind's instruction "not to say anything" targeted some or all of this information.

Moreover, there is other evidence to support a finding of corrupt persuasion. For example, the government claims Edlind and Chujoy used the June 16 dinner to plant key facts in Kwiatkowski's mind in hopes that Kwiatkowski's later trial testimony would support Chujoy's defense. Specifically, the government cites Edlind's discussion on June 16 about Chujoy's habit of joking and lying. In his June 3 letter, Chujoy told Edlind to inform Kwiatkowski that he could not tell when Chujoy was joking and when he was being serious. Gov't Ex. 28.2. Channeling this instruction, Edlind engaged in a detailed conversation about times Kwiatkowski failed to recognize when Chujoy was joking. The government theorizes that Edlind sought to convince Kwiatkowski that Chujoy often said things in jest or embellished his stories, hoping Kwiatkowski would recant or waver when he testified about Chujoy's past incriminating statements. Even if Kwiatkowski did not fully withdraw his

31

prior statements to federal agents, if Kwiatkowski admitted during the Inca's Secret trial that he could not tell when Chujoy was joking or lying, so the theory goes, the jury would be less likely to believe Kwiatkowski's testimony. The same is true for Edlind's discussion of the underlying facts in the Inca's Secret case—the government believes Edlind tried to plant misleading facts in Kwiatkowski's head, in hopes he would adopt those facts at trial. As an example, the government notes that Edlind "corrected" Kwiatkowski when he stated that Chujoy was a manager at the Inca's Secret Restaurant, telling him that Chujoy was more like a "volunteer" manager.

This view of witness tampering is novel, but finds support in the case law. Courts have found that witness tampering (either by means of corrupt persuasion or misleading conduct) includes a defendant "reminding" or "coaching" a witness about certain facts— which were false or misleading—in hopes the witness would adopt that false account as his own. United States v. Bedoy, No. 15-10438, 2016 WL 3568094, at *11 (5th Cir. June 30, 2016); United States v. LaFontaine, 210 F.3d 125, 133 (2d Cir. 2000); United States v. Rodolitz, 786 F.2d 77, 81–82 (2d Cir. 1986). Even absent proof of falsity, a defendant can also corruptly persuade a witness by pushing them to claim personal knowledge of facts when in fact the witness has no prior knowledge of those facts. United States v. LaShay, 417 F.3d 715, 719 (7th Cir. 2005). Here, Edlind's suggestion that Kwiatkowski could not identify when Chujoy was joking and lying, her discussion of the underlying facts in the Inca's Secret case, and her outline of the weakness in the government's evidence mirrors Chujoy's June 3 letter and can be reasonably construed as an attempt to undermine Kwiatkowski's trial testimony and persuade Kwiatkowski to adopt statements as his own during trial. When this

32

evidence is considered alongside other evidence from the June 16 dinner—namely Edlind's instructions to Kwiatkowski to deny knowledge of certain facts—the record is sufficient to sustain a conviction on Count Two.

Admittedly, the government's evidence of witness tampering is largely circumstantial. Moreover, there is contrary evidence suggesting Edlind never intended to influence Kwiatkowski's testimony. For example, Edlind encouraged Kwiatkowski to abide by his trial subpoena and assured him he was not a target of the pending prosecution. Gov't Ex. 92 43:05–49:10. Both Edlind and her husband also told Kwiatkowski at one point to "tell the truth" and to not worry if his testimony was damaging to Chujoy. Id. at 45:25–46:20; 12/18 Trial Tr. 137:2–12. Even Kwiatkowski conceded that the Edlind never "trick[ed]" or "misled" him during the dinner on June 16, and waffled when asked if Edlind ever told him what to say or what not to say in court. 12/18 Trial Tr. 137:13–138:13.

Nevertheless, the circumstances surrounding the June 16 dinner contradict defendants' claim of innocent intent. First, the proximity of trial: trial in the Inca's Secret case was set for June 22, 2015. A few weeks before this trial date, Chujoy received Kwiatkowski's interview with federal agents, and took immediate steps to contact Kwiatkowski through Smith and Edlind. Chujoy's June 3 letter to Edlind strikes an urgent tone—Chujoy asked Edlind to speak with Kwiatkowski "ASAP" and stated that it was "crucial" she clarify his testimony. Gov't Ex. 28.2. This same sense of urgency is reflected in Edlind's subsequent effort to arrange a June 16 dinner meeting with Kwiatkowski. On these facts, a reasonable juror could conclude that Chujoy and Edlind were attempting to reach Kwiatkowski before he testified at trial.

Second, both Chujoy and Edlind took active steps to conceal their behavior. Chujoy hid his phone calls to Smith using another inmate's PIN number, and placed his instructions to Edlind in hard-to-monitor jail letters. For her part, Edlind refused to discuss Chujoy's June 3 letter over the phone because she believed the government might be listening. Instead, she required an in-person meeting with Kwiatkowski. She went so far as to require Kwiatkowski to keep his cell phone outside during the June 16 dinner conversation.

Third, Donald Smith's reaction to the June 5 phone call is telling. As he did with Edlind, Chujoy reached out to Smith to encourage him to "clarify" things with Kwiatkowski. Smith refused, stating he did not want to do anything that could be seen as "chang[ing] [Kwiatkowski's] testimony." Gov't Ex. 61. While Smith's personal discomfort with Chujoy's request does not, by itself, prove that Chujoy's request was improper, it does push against any claim of innocent intent.

Finally, Edlind and Chujoy were aware in June 2015 that it was problematic for Chujoy to communicate with witnesses. Edlind knew Chujoy had been instructed, as a condition of his bond, to have no contact with potential witnesses. Edlind also knew that Chujoy had been re-indicted on new charges of witness tampering. Edlind nevertheless chose to contact Kwiatkowski on Chujoy's behalf—and pass messages related to Kwiatkowski's interview with federal agents—mere days before the June 22 trial. Further, Chujoy continued to contact Kwiatkowski via text after he was released from jail a second time in late June 2015, even after being ordered again to have no contact with witnesses. He stopped only after Kwiatkowski made it clear he would not talk with him until after trial.

34

While this evidence is highly circumstantial and sometimes contradictory, when viewed in context and construed in the government's favor, it is sufficient to support a finding that Edlind and Chujoy were "conscious of [their] wrongdoing" and acted with the "specific intent to subvert or undermine the due administration of justice." Arthur Andersen, 544 U.S. at 704–06. Rule 29 commands that this court to review the cumulative effect of the evidence and focus on the "complete picture that the evidence presents." United States v. Burgos, 94 F.3d 849, 863 (4th Cir. 1996). The court is bound by this standard and cannot "overturn a substantially supported verdict merely because it finds the verdict unpalatable or determines that another, reasonable verdict would be preferable." Id. In light of Kwiatkowski's knowledge of the Inca's Secret case, Chujoy's repeated attempts to contact Kwiatkowski, the frenzied chain reaction of events caused by Kwiatkowski's interview with federal agents, Edlind's subsequent efforts to contact Kwiatkowski, and Edlind's conversation with Kwiatkowski on June 16, the court cannot say that no reasonable juror could find, beyond a reasonable doubt, that Edlind and Chujoy were guilty of witness tampering. A jury was entitled to believe the government's circumstantial evidence and disbelieve defendants. Accordingly, the motion for acquittal on Count Two is **DENIED**.

### B. Count 1: Conspiracy to Witness Tamper

Count One alleges that Chujoy and Edlind conspired to tamper with witnesses in the Inca's Secret case in violation of 18 U.S.C. § 1512(k). Notably, § 1512(k) does not require proof of an overt act. United States v. Johnson, No. 05-CR-80337, 2009 WL 3101012, at *4 (E.D. Mich. Sept. 23, 2009); United States v. Wegers, No. 05-CR-0231C, 2005 WL 2573343, at *2 (W.D. Wash. Oct. 11, 2005); cf. United States v. Bolden, 325 F.3d 471, 491 (4th Cir.

2003) (distinguishing the overt act requirement under the general conspiracy statute from other conspiracy statutes). Instead, the government must show only: (1) that an agreement existed between Chujoy and Edlind to tamper with witnesses; (2) that Chujoy and Edlind knew of this conspiracy; and (3) that they knowingly and voluntarily became a part of a conspiracy to witness tamper. 18 U.S.C. § 1512(b)(1); § 1512(k).

As in Count Two, the events surrounding the June 16 dinner are dispositive of Count One. The government offered evidence that Edlind and Chujoy maintained a steady contact while Chujoy was in Rockingham County Regional Jail, including conversations about Kwiatkowski. There was further evidence that both Edlind and Chujoy knew that Kwiatkowski was a potential witness in the Inca's Secret case, as evidenced by Chujoy's June 3 letter to Edlind. Disclosure of Kwiatkowski's witness interview set off a flurry of activity, culminating in the June 16 dinner in which Edlind parroted statements from Chujoy's June 3 letter and twice told Kwiatkowski "not to say anything" or "not to mention" things about Chujoy. Taking this evidence in context—especially considering the proximity of the Inca's Secret trial and defendants' efforts to conceal their behavior—the trial record is sufficient for a reasonable juror to conclude that the defendants knowingly and voluntarily formed a conspiracy to tamper with Kwiatkowski's trial testimony in the Inca's Secret case. Accordingly, defendants' motion for acquittal on Count One is **DENIED**.

### C. Count 3: Obstruction

Count Three alleges that Chujoy and Edlind obstructed justice by attempting to influence the testimony and statements of Kwiatkowski in violation of 18 U.S.C. § 1503(a). Obstruction requires proof: (1) that there was proceeding pending before a federal court; (2)

36

that the defendant knew of the pending judicial proceeding; (3) that the defendant endeavored to influence, obstruct, or impede the due administration of justice in that judicial proceeding; and (4) that the defendant's act was done "corruptly," that is, that the defendant acted knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice. United States v. Richardson, 676 F.3d 491, 506 (5th Cir. 2012); United States v. Blair, 661 F.3d 755, 766 (4th Cir. 2011); United States v. Grubb, 11 F.3d 426, 437 (4th Cir. 1993). The government need not show that justice was actually obstructed, only that defendants' acts had "the natural and probable effect of interfering with the due administration of justice." Blair, 661 F.3d at 766 (quoting United States v. Aguilar, 515 U.S. 593, 599 (1995)). As the Fourth Circuit explained, "[b]ecause evidence of intent will almost always be circumstantial . . . a defendant may be found culpable where the reasonable and foreseeable consequences of his acts are the obstruction of justice." United States v. Brooks, 111 F.3d 365, 372 (4th Cir. 1997).

While obstruction and witness tampering contain different elements, they often rely on similar evidence. Cf. United States v. Kenny, 973 F.2d 339, 342–43 (4th Cir. 1992). Here, the evidence of witness tampering and conspiracy suffices to show that Chujoy and Edlind intended to obstruct the due administration of justice, in that a reasonable juror could find that defendants tried to corruptly influence Kwiatkowski's testimony in the Inca's Secret case. Defendants' motion for acquittal on Count Three is thus **DENIED**.

### D. Count Four: Perjury

The two remaining counts involve Edlind and her alleged perjury before the grand jury. Unlike Counts One, Two, and Three, the court finds the evidence on these remaining

37

counts insufficient to sustain a conviction. The government's evidence from the October 6 grand jury session is simply too slim to satisfy the requirements of Rule 29.[11]

Perjury under 18 U.S.C. § 1623 requires proof that: (1) Edlind gave sworn testimony before a federal grand jury; (2) that her testimony was false; (3) that she knew the testimony was false when she gave it; and (4) that the subject matter of the testimony was material to the grand jury investigation. United States v. Sarihifard, 155 F.3d 301, 306 (4th Cir. 1998). Though six instances of false conduct were submitted to the jury, the government needs sufficient evidence on only one to prevail. Id. at 310 ("[W]hen an indictment charges multiple instances of conduct listed in the conjunctive, a jury verdict of guilty will stand if the jurors unanimously agree as to only one of the instances of conduct alleged in the indictment.").

Elements (1) and (4) are not in dispute, but Edlind raises four arguments on elements (2) and (3). First, she alleges that some of her answers were literally true. Second, she claims the government asked fundamentally ambiguous questions. Third, she generally claims the evidence at trial was insufficient to show that her statements were false, or that she knew her testimony was false when she gave it. Finally, Edlind objects to the absence of a special unanimity instruction in Count Four. For the reasons stated below, the court finds several of these arguments well-taken.

---

[11] The court offers three observations on Count Four. First, the indictment identifies nine allegedly false statements Edlind made during her October 6 testimony. However, both at trial and in its subsequent briefing, the government combined two of the statements into a single exchange. To avoid confusion, the court will adopt the government's approach and assume that Count Four alleges eight separate false statements by Edlind, two of which were struck prior to jury deliberations. Second, the government labels these statements as "Statement One, Statement Two," etc. The court will again adopt this construction. However, it notes that the government's numbering does not match the order in which the statements were asked during Edlind's grand jury testimony. Finally, the transcript of Edlind's grand jury testimony was introduced as an exhibit and read into the record. The court will cite to both in its analysis of Count Four.

Case 5:15-cr-00029-MFU   Document 134   Filed 09/14/16   Page 38 of 59   Pageid#: 2916

### 1. Literal Truth and Fundamental Ambiguity

Two defenses raised by Edlind require further explanation. As a matter of law, a defendant is not guilty of perjury where her allegedly false statement is "literally true but not responsive to the question asked and arguably misleading by negative implication." Bronston v. United States, 409 U.S. 352, 353 (1973). This doctrine—sometimes called the "literal truth defense"—rests on the principle that "[a] jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner." Id. at 359.

However, the literal truth defense is a "narrow one . . .[that] applies only where a defendant's allegedly false statements were *undisputedly* literally true." United States v. Sarwari, 669 F.3d 401, 406 (4th Cir. 2012) (emphasis in original). Accordingly, the Fourth Circuit rarely invokes its protection. See, e.g., United States v. Good, 326 F.3d 589, 591–92 (4th Cir. 2003); United States v. Earp, 812 F.2d 917, 918–20 (4th Cir. 1987). Nevertheless, the Fourth Circuit has repeatedly made clear that literally true answers, even if evasive, cannot support a perjury conviction. United States v. Bollin, 264 F.3d 391, 411 (4th Cir. 2001) (citations omitted).

Likewise, answers to fundamentally ambiguous questions cannot support a perjury conviction. Sarwari, 669 F.3d at 407. A question is fundamentally ambiguous when it includes phrases about "which men of ordinary intellect [would not] agree" or phrases that "could not be used with mutual understanding by a questioner and answerer unless it were defined at the time." United States v. Lighte, 782 F.2d 367, 375 (2d Cir. 1986). Several factors affect fundamental ambiguity, including:

39

> (1) the inherent vagueness—or, conversely, the inherent
> clarity—of certain words and phrases, (2) the compound
> character of a question, (3) the existence of defects in syntax or
> grammar in a question, (4) the context of the question and
> answer, and (5) the defendant's own responses to allegedly
> ambiguous questions.

United States v. Strohm, 671 F.3d 1173, 1179 (10th Cir. 2011) (citing Linda F. Harrison, The Law of Lying: The Difficulty of Pursuing Perjury Under the Federal Perjury Statutes, 35 U. Tol. L. Rev. 397, 404 (2003)).

However, "[f]undamental ambiguity is the exception, not the rule." Farmer, 137 F.3d at 1268–69. A question is not fundamentally ambiguous "when it is entirely reasonable to expect a defendant to have understood the terms used in the questions." United States v. Long, 534 F.2d 1097, 1101 (3d Cir. 1976). Put differently, when a question is "merely susceptible to multiple interpretations, and a defendant's answer is true under one understanding of the question but false under another, the fact finder determines whether the defendant knew his statement was false." Sarwari, 669 F.3d at 407. This distinction has caused courts to divide the "ambiguity defense" into two parts: fundamental ambiguity and arguable ambiguity. Id. at 407–10; Strohm, 671 F.3d at 1179–83. The former is a question of law for the court. Sarwari, 669 F.3d at 407. The latter is a challenge to the sufficiency of the evidence, and requires only that the court determine if the evidence was sufficient for a reasonable juror to convict. Sarwari, 669 F.3d at 409; Strohm, 671 F.3d at 1181.

### 2. Statement One Does Not Support a Perjury Conviction

Statement One includes the following exchange:

> **Q1.** After Chujoy's arrest in March 2015, did you ever receive any written communications where you were supposed to discuss any particular issues with Mr. Kwiatkowski?
>
> **A1.** No.

12/18 Trial Tr. 59:12–16; Gov't Ex. 27 132:1–4. The government claims this question is broadly worded to capture any written communication Edlind received between Chujoy's arrest in March 2015 and her testimony in October 2015. Under this interpretation, Edlind's answer in Statement One is false because Chujoy sent Edlind a letter dated June 3, 2015, in which he asked Edlind to speak with Kwiatkowski about statements Kwiatkowski made to law enforcement. Gov't Ex. 28.2.

For her part, Edlind argues that Statement One is fundamentally ambiguous, since the phrase "after Mr. Chujoy's arrest in March 2015" can have two meanings. On the one hand, the phrase could refer to any period between Chujoy's arrest in March 2015 and Edlind's grand jury testimony in October 2015. On the other hand, the phrase could refer only to the period immediately following Chujoy's arrest. Because Edlind believes reasonable people could disagree as to the temporal scope of the question, she argues her answer cannot support a perjury charge as a matter of law.

In the alternative, Edlind argues there is no evidence that she knowingly lied in Statement One. She notes that she turned over the June 3 letter—which is the only evidence of falsity for Statement One—earlier in her October grand jury testimony. She finds it inconceivable that a reasonable juror could conclude, beyond a reasonable doubt, that she gave a knowingly false answer when she voluntarily provided the government that same day with the very letter that gave rise to her perjury prosecution.

41

Edlind's arguments are well-taken. First, the ambiguity of the question. It is difficult—if not impossible—to distinguish between questions that are fundamentally ambiguous and questions that are merely arguably ambiguous. Farmer, 137 F.3d at 1269. However, the distinction in this case is immaterial, as the court would reach the same result regardless of the label attached to Statement One. At minimum, Statement One poses a question that could have two different meanings. That is, the phrase "after Chujoy's arrest in March 2015" could capture written communications Edlind received at any point between March 2015 and October 2015, or it could limit the question to only those written communications received immediately after Chujoy's arrest in March 2015. While the government embraces the former interpretation, Edlind reasonably could have interpreted the question to mean the latter.

Thus, it was incumbent on the government to show that Edlind understood the question in the same way as the government. Sarwari, 669 F.3d at 409. It is not enough for the jury to merely guess as to the meaning Edlind ascribed to Statement One. Id. Instead, the government must offer some evidence, whether circumstantial or direct, from which a jury "could conclude beyond a reasonable doubt that the defendant understood the question as did the government and that, so understood, the defendant's answer was false." United States v. Thomas, 612 F.3d 1107, 1116 (9th Cir. 2010) (citing United States v. Sainz, 772 F.2d 559, 562 (9th Cir. 1985)). Absent such proof, the government cannot carry its burden to show that the defendant "knowingly rendered false testimony" as required under § 1623. Farmer, 137 F.3d at 1269; see also United States v. Schulte, 741 F.3d 1141, 1153 (10th Cir. 2014) (noting that a perjury conviction must be supported "by evidence sufficient to negate

42

the defendant's alleged understanding of the question"); United States v. Glantz, 847 F.2d 1, 6 (1st Cir. 1988) ("The principles underlying the Bronston decision also bar perjury convictions for arguably untrue answers to vague or ambiguous questions when there is insufficient evidence of how they were understood by the witness.").

In this case, the government offered no evidence to suggest what Statement One meant to Edlind when she answered it. The grand jury transcript provides little context, as the grand jury prosecutor did not probe further about written communications Edlind received, nor attempted to pin Edlind down with specific questions about the June 3 letter. Moreover, Edlind's answers elsewhere in her grand jury testimony shed no light on her interpretation of Statement One. On this record, "[o]nly by surmise and conjecture could the jury conclude that [Edlind] understood the question as the prosecutor did." Farmer, 137 F.3d at 1270. This is not sufficient under Rule 29. Sarwari, 669 F.3d at 409 (noting that "the jury is not permitted to guess as to the meaning the defendant ascribed to a question").

Edlind's second argument about intent also has merit. As Edlind notes, "[a]n accused can be convicted of perjury under § 1623 only if [her] statement to the grand jury was knowingly false." United States v. Kelly, 540 F.2d 990, 994 (9th Cir. 1976). Even assuming arguendo that Statement One can be interpreted as the government claims, the government must prove that Edlind's false statement was intentional, rather than the result of confusion or mistake. Sarihifard, 155 F.3d at 306. Yet, in this case, the evidence overwhelmingly shows that Edlind's answer in Statement One—even if technically false—was unintentionally so. The June 3 letter, which asks Edlind to speak with Kwiatkowski about his interview with federal agents, is the only evidence showing that Edlind's answer in

43

Statement One is false. Edlind truthfully answered questions about this letter earlier in her grand testimony, readily acknowledged that Chujoy sent her letters from prison and agreed to provide those letters to the government. Gov't Ex. 27 74:1–79:22. In fact, Edlind arranged with Agent Ketcham for her husband to retrieve all of Chujoy's letters—including the June 3 letter—from her home during a break in her grand jury testimony. 12/17 Trial Tr. 42:1–43:25; 50:1–20. It defies reasonable belief that Edlind would knowingly lie about the contents of the June 3 letter when she voluntarily provided the original, unaltered June 3 letter to the government mere hours before. This finding is further strengthened when one realizes (1) that Edlind's October grand jury testimony came months after she received the June 3 letter, (2) that the grand jury prosecutor asked general questions about "written communications" without specifying the June 3 letter, (3) that Statement One came at the end of Edlind's grand jury testimony, and (4) that the relevant question is the last in a rapid string of questions about Kwiatkowski.

More to the point, the government offered no proof to the contrary. While issues of intent are typically resolved by the fact-finder, a jury may not rely on pure speculation to convict. As the Fifth Circuit aptly noted, "[e]specially in perjury cases, defendants may not be assumed into the penitentiary." United States v. Brumley, 560 F.2d 1268, 1277 (5th Cir. 1977). The court could divine no evidence in the trial record, either from witness testimony or from Edlind's grand jury transcript, from which a reasonable juror could infer that Edlind knew that her answer in Statement One was false when she made it.

In sum, the evidence is insufficient to establish beyond a reasonable doubt that Edlind gave a knowingly false answer in Statement One. Whether framed in terms of

44

ambiguous questions or evidence of knowing falsity, the trial record is simply insufficient for a reasonable juror to find, beyond a reasonable doubt, that Edlind's answer in Statement One was perjurious. Accordingly, Statement One cannot support a conviction on Count Four.

### 3. Statement Two Does Not Support a Perjury Conviction

Statements Two and Three also do not support a perjury conviction. Statement Two cites the following grand jury testimony:

> **Q1.** Have you had been [sic] dinner with Mr. Kwiatkowski after Felix's arrest in March of 2015?
>
> **A1.** Yes. We met at El Charro on Port Road with him and Christina. . .
>
> **Q2.** When was that?
>
> **A2.** April maybe. . .
>
>           \* \* \* \*
>
> **Q3.** Okay. And what did you guys discuss at this dinner?
>
> **A3.** Same thing we discussed on the phone, just 'Be careful and tell the truth,' and just the normal parental advice.

12/18 Trial Tr. 60:21–63.3; Gov't Ex. 27 123:8–124:9. As to Edlind's first two answers, the government faults her for not mentioning the March dinner at her home and the June 16 dinner at El Charro. As to Edlind's third answer, the government claims she intentionally misled the grand jury by not admitting that she discussed Chujoy's ongoing prosecution with Kwiatkowski and Kang during the dinners in March and June. Based on this evidence, the government claims a reasonable juror could find Edlind guilty of perjury. The court disagrees.

45

First, the court observes that the trial record is unclear about dates and times for many of the dinners at El Charro. Kwiatkowski and Kang testified that they had regular dinners with Edlind. Most occurred at El Charro, and were usually attended by Edlind, her husband Gary Edlind, Kwiatkowski, and Kang. 12/17 Trial Tr. 180:7–185:21; 12/18 Trial Tr. 82:11–84:4; 87:16–88:20. However, neither Kwiatkowski nor Kang could remember the dates for every dinner. Kang described them as "sporadic," and recalled that the last dinner she attended was on May 12, 2015. 12/17 Trial Tr. 180:7–185:21. Kwiatkowski was more specific, testifying that the El Charro dinners occurred once every two or three weeks after Chujoy's March arrest, which would place at least one dinner in April. 12/18 Trial Tr. 88:15–20. There was also direct testimony about the June 16 dinner at El Charro, as well as the March dinner at Edlind's home. See, e.g., 12/17 Trial Tr. 180:15–182:9; 12/18 Trial Tr. 84:5–85; 100:2–103:5.

Critically, there is no evidence that Edlind's first two answers—that she had dinner with Kwiatkowski and Kang in April—were false. In fact, the record strongly suggests that Edlind's answers were truthful. Kwiatkowski's estimate about the frequency of the El Charro dinners places one dinner squarely in April. The government offered no evidence to the contrary. Thus, there is nothing to support a conclusion that Edlind lied when she spoke about an April dinner at El Charro.

Instead, the government focuses on Edlind's omission of the March dinner at her home and the June 16 dinner at El Charro. However, Edlind was not asked about dinners in March and June. She was asked generally if she had dinner with Kwiatkowski after Chujoy's arrest. She answered in the affirmative, describing an April dinner with Kwiatkowski and

46

Kang. Nothing introduced at trial implies that this answer is false. Cf. Farmer, 137 F.3d at 1269 (noting that a perjury conviction must "rest on precise questioning" even under the "deferential" sufficiency-of-the-evidence standard).[12]

Moreover, it is not perjurious for Edlind to give an evasive answer to a broadly-worded question, so long as her response was not false. See United States v. Reveron Martinez, 836 F.2d 684, 689 (1st Cir. 1988) ("In order to sustain a perjury charge, evasions are not enough. The government must show more than that the interdicted statement was unresponsive or guarded. At a bare minimum, the remark must have been literally false."); United States v. Earp, 812 F.2d 917, 919 (4th Cir. 1987) ("The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry."); United States v. Naegele, 341 B.R. 349, 359 (D.D.C. 2006) ("[I]n the context of perjury charges based on adversarial questioning, it is not the declarant's burden to provide candid answers."). Accordingly, the government failed to offer sufficient evidence that Edlind's first two answers—that she had dinner with Kwiatkowski in April—were false. No reasonable juror could conclude otherwise.

Edlind's answer to the third question is no different. Edlind was asked about the discussion at "this dinner." Of course, "this dinner" can only refer to the April dinner mentioned in Edlind's prior answers. United States v. Paolicelli, 505 F.2d 971, 973 (4th Cir. 1974) (noting that alleged false statements must be considered in the context they were

---

[12] Moreover, Edlind actually admitted only a few questions later that she had other dinners with Kwiatkowski, including at least one that took place in her home. 12/18 Trial Tr. 64:13–65:1; Gov't Ex. 27 127:8–19. She also stated that she "didn't think" there were any other dinners at El Charro, but then estimated that "there may have been two, but I don't know." 12/18 Trial Tr. 64:13–65:1; Gov't Ex. 27 127:20–128:4. The government has not alleged that these answers were false.

47

given). Edlind responded that she, Kwiatkowski, and Kang discussed the "same thing we discussed on the phone, just 'Be careful and tell the truth,' and just the normal parental advice."

The government claims this third answer is also false. It again points to the March and June 16 dinners, noting that Edlind told Kwiatkowski "not to know anything" during the March dinner and talked about Kwiatkowski's trial testimony during the June dinner. 12/18 Trial Tr. 85:10–86:2; Gov't Exs. 71, 73. Citing this evidence, the government claims Edlind lied because she failed to disclose the full scope of her conversations with Kwiatkowski.

However, as noted above, Statement Two focuses on an April dinner at El Charro. Evidence from dinners in March and June is irrelevant. To prove perjury, the government needed some evidence, however slight, from which a jury could find beyond a reasonable doubt that Edlind falsely described the conversation that occurred during an April dinner at El Charro. No such evidence exists in the record.

In fact, the record supports Edlind's description of the April dinner. Edlind told the grand jury that she talked about "being careful," "telling the truth," and "just the normal parental advice" at the April dinner. When asked to elaborate, she explained that she discussed Kwiatkowski's and Kang's "well-being" and "working life," as well as newspaper reports about Chujoy's case. Gov't Ex. 27 123:8–125:19. This description tracks Kwiatkowski's and Kang's description of the usual El Charro dinner conversation. Kwiatkowski and Kang testified that the typical El Charro dinner—which, based on Kwiatkowski's estimate, would include a dinner in April—included discussions about their

48

"reactions" to the events surrounding Chujoy's case, their feelings towards Chujoy and his family, and Chujoy's condition in prison. 12/17 Trial Tr. 183:11–22; 12/18 Trial Tr. 81:20–82:7. This testimony tracks Edlind's description of the April dinner conversation.

As an aside, the court recognizes that Edlind's answers do not fit squarely into Bronston's literal truth defense. Bronston addresses answers that are both non-responsive and literally true and "is inapplicable to answers that are responsive or not undisputably true." Strohm, 671 F.3d at 1185. In this case, Edlind's answers were responsive to the questions asked. When asked about a dinner with Kwiatkowski, she responded that she had dinner with him in April. When asked to describe the conversation at this dinner, she offered her recollection of what was said. Further, it is a stretch to conclude that Edlind's answers are indisputably true. While the testimony from Kwiatkowski and Kang suggests that Edlind accurately described an April dinner, the jumbled nature of the record makes it difficult to confirm that Edlind's account is literally correct. Nonetheless, literal truth defense or no, there must be "sufficient evidence demonstrating beyond a reasonable doubt that [Edlind's] answers were knowingly false." Id.; see also United States v. Makris, 483 F.2d 1082, 1086 (5th Cir. 1973) (noting that a defendant charged with perjury "bears no burden to show that [s]he spoke truthfully"). Even when the record is construed in the light most favorable to the government, there is no evidence that any of the three answers in Statement Two were false. Accordingly, Statement Two cannot support a perjury conviction.

49

### 4. Statement Three Does Not Support a Perjury Conviction

The government fares no better in Statement Three. Statement Three cites a single question and answer:

> **Q1.** Did you ever discuss – during this dinner, did you ever discuss what Mike or Christina or Yuri or yourself should say to people?
>
> **A1.** No. Just tell the truth.

12/18 Trial Tr. 62:23–63:5; Gov't Ex. 27 125:20–23. Importantly, Statements Two and Three come from the same three pages of Edlind's grand jury testimony. 12/18 Trial Tr. 59:10–63:3; Gov't Ex. 27 123:8–125:23. Viewed in context, it is clear that the dinner referenced in Statement Three is the same April dinner at El Charro referenced in Statement Two. And, as with Statement Two, the government offered no evidence that Edlind testified falsely about this particular dinner. Evidence about what Edlind said in other conversations at other times is unavailing. Thus, Statement Three also cannot support a perjury conviction.

### 5. Statements Four, Five, and Six Do Not Support a Perjury Conviction

Both Edlind and the government analyzed Statements Four, Five, and Six together. Statements Five and Six come in succession, and include the following exchange:

> **Q1.** Okay. Did Mr. Chujoy tell you what to say to other people?
>
> **A1.** Never.
>
> **Q2.** Did Mr. Chujoy ever ask you to speak to anyone on his behalf?
>
> **A2.** Not to my recollection, no.

50

12/18 Trial Tr. 59:12–16; Gov't Ex. 76:21–77:1.  In the government's view, these two questions are broadly worded questions targeting any communication between Edlind and Chujoy.  Based on this interpretation, the government claims Edlind lied because she failed to mention Chujoy's June 3 letter asking her to speak with Kwiatkowski and the June 16 dinner where she conveyed Chujoy's message to Kwiatkowski.

For her part, Edlind argues these two questions are arguably ambiguous and should be read in context.  Edlind claims the grand jury prosecutor was asking questions only about in-person conversations between Edlind and Chujoy during her visits to the jail.  She suggests this line of questioning never asked about letters from Chujoy.

Edlind's argument is on point.  Read in context, Statements Five and Six address conversations between Edlind and Chujoy during her jail visits.  For example, Edlind was asked the following questions moments before Statements Five and Six:

> **Q:** And when you would visit Mr. Chujoy in jail would you have conversations with him?
>
> **A:** As much as you can.  I've never spoken to anyone from jail before, it's very had to have a conversation.
>
> **Q:** Were you able to speak with Mr. Chujoy?
>
> **A:** I was able to speak with him, I'm just saying it was difficult, yes.  And we – it was just basically support and love and just, you know . . .
>
> * * * *
>
> **Q:** Were you able to see Mr. Chujoy on the other side of the glass?
>
> **A:** Yes.
>
> **Q:** Were you able to hear Mr. Chujoy on the other side of the glass?

51

**A:** Randomly, it was tough.

**Q:** But you were able to carry on a conversation of some kind?

**A:** Yeah.

Gov't Ex. 27 75:4–24.

Statements Five and Six come after this exchange. The grand jury prosecutor then stopped the examination to allow for a bathroom break. When she resumed, the prosecutor summarized where her questioning left off:

**Q:** Ms. Edlind, we just took a break; is that right?

**A:** Yes.

\* \* \* \*

**Q:** Now, before the break I think we were describing Mr. Chujoy while – you visited Mr. Chujoy while he was incarcerated in jail?

**A:** Yes.

**Q:** And you had conversations with him during those visitations?

**A:** Yes.

Gov't Ex. 27 78:18–80:12.

The context is clear—when read in its entirety, this portion of the grand jury session is focused only on Edlind's jail visits with Chujoy. Even the grand jury prosecutor understood that Statements Five and Six were probing in-person jail conversations between Edlind and Chujoy. Thus, to show that Edlind's answers were knowingly false, the government needed evidence that Chujoy and Edlind discussed witness tampering during Edlind's jail visits. No such evidence was admitted.

In short, the government cannot "lift[ ] a statement of the accused out of its immediate context and thus giv[e] it a meaning wholly different than that which its context clearly shows." United States v. Paolicelli, 505 F.2d 971, 973 (4th Cir. 1974) (citing Fotie v. United States, 137 F.2d 831, 842 (8th Cir. 1943)). Set in their proper context, Statements Five and Six were directed only at in-person conversations between Edlind and Chujoy when she visited him in jail. Because the government presented no evidence to negate Edlind's reasonable interpretation of these questions, and offered no proof that Edlind misrepresented her jail conversations with Chujoy, no reasonable juror could conclude that she gave false answers in Statements Five and Six.

Statement Four is a different animal altogether. This statement includes the following exchange:

> **Q1.** And Mr. Chujoy asked you to speak to Mike?
>
> **A1.** To see how he is, that's all.
>
> **Q2.** And did you do that?
>
> **A2.** I called him once, maybe twice. He texted me once and then nothing after that. And we met once too, oh, I forgot about that.

12/18 Trial Tr. 59:12–16; Gov't Ex. 27 122:2–8. The government maintains that the two questions in Statement Four are general questions about any instructions Chujoy gave Edlind during his time in jail. To prove falsity, the government again points to evidence from Chujoy's June 3 letter. It argues that Edlind's first answer in Statement Four—that Chujoy only asked Edlind to check in with Kwiatkowski—is plainly false in light of Chujoy's instructions in the June 3 letter.

For her part, Edlind argues context is still important. She claims the questions in Statement Four are similar to those in Statements Five and Six and circle back to questions she was asked earlier in her testimony. Specifically, she believes Statement Four asks only about jail visits and jail phone calls between her and Chujoy. Because Edlind believes Statement Four is limited to these communications—and not Chujoy's letters to her—she argues that her answers were literally true.

The court agrees that Statement Four must be read in context. However, the redactions to Edlind's grand jury transcript make it impossible to fairly analyze this statement. At trial, the government initially tried to introduce an unredacted transcript of Edlind's grand jury transcript. After a sustained objection by Chujoy, the government redacted sections of the transcript. Because Chujoy's objection was unexpected and came in the middle of trial, no one (including the court) considered how these redactions would affect Statement Four.

A close reading shows that the redactions fundamentally alter the context of Statement Four. Whole stretches of relevant testimony are excluded. The five pages immediately preceding Statement Four are entirely blacked out. This missing testimony gives the false impression that the questions in Statement Four were asked in a vacuum and leaves Edlind and the government without a leg to stand on. Absent the full transcript, neither Edlind nor the government could have effectively argued their respective interpretations of Statement Four to the jury. Nor could the jury fairly judge whether Edlind's interpretation of Statement Four was reasonable and, if not, whether the government submitted sufficient evidence that she gave knowingly false answers.

54

This flaw is not present elsewhere in Count Four. The context for Statements One, Two, Three, Five, and Six is unchanged in the redacted transcript, and the court remains confident in its analysis of those statements. Only Statement Four is affected. Accordingly, the court finds it necessary to strike this statement. In the event Edlind is granted a new trial on Count Four, the parties are instructed to carefully review the unredacted transcript to ensure all relevant information is provided to the jury.

In sum, the court concludes that none of the six statements submitted to the jury support a conviction for perjury. Accordingly, Edlind's motion for acquittal on Count Four must be granted.[13]

### 6. Alleged Error in the Jury Instructions

Edlind also claims error in the jury instructions for Count Four, citing the lack of a special unanimity instruction. In contrast to a general unanimity instruction—which was given in this case—a special unanimity instruction requires that the jury not only unanimously agree that Edlind made a knowingly false statement, but also unanimously concur in the knowing falsity of at least one specific statement made before the grand jury. Because a judgment of acquittal on Count Four is warranted on other grounds, the court need not reach this alleged error. Nevertheless, two observations are warranted.

First, the court doubts its authority to entertain objections to the jury instructions. The only pending motion is defendants' joint motion for acquittal under Rule 29.

---

[13] Because the court strikes all of the allegedly false statements submitted to the jury, it need not address the thorny issue presented when a court strikes some, but not all, of the alleged false statements charged under a single count. At least one circuit court reversed a judgment of conviction and remanded for a new trial after striking some of alleged false statements submitted to the jury, noting that the defendant's perjury conviction "could have been based on answers that should not have been considered by the jury or on others that he truthfully answered." United States v. Lighte, 782 F.2d 367, 377 (2d Cir. 1986). Whether a district court has authority to grant similar relief in the absence of a timely-filed Rule 33 motion is unclear.

Case 5:15-cr-00029-MFU   Document 134   Filed 09/14/16   Page 55 of 59   Pageid#: 2933

Insufficiency of the evidence is the only ground for an acquittal under this rule. 2A Charles

A. Wright, Federal Practice and Procedure: Criminal § 466 (4th ed. 2016) (internal citations

omitted). Accordingly, a Rule 29 motion is "not the proper vehicle for raising an objection

to jury instructions." United States v. Crowe, 563 F.3d 969, 973 n.5 (9th Cir. 2009). Instead,

"[t]he usual remedy for an error in a jury instruction is retrial." United States v. Cohen, 301

F.3d 152, 158 (3d Cir. 2002). Thus, even if the court agreed that a special unanimity

instruction was necessary, it likely lacks authority to grant relief on this ground absent a

timely filed Rule 33 motion.

Second, assuming the court has authority to review the jury instructions, Edlind's

claim of error faces an uphill battle. Edlind did not request a special unanimity instruction

and did not object to its omission. Indeed, this issue arose only after the court required the

parties to file supplemental briefs on Count Four after the May 11 hearing. Accordingly,

Edlind's challenge to the jury instructions—if it can be addressed at all—can only be

reviewed for plain error. And controlling and persuasive precedent is mixed on special

unanimity instructions.

On the one hand, both the Sixth Amendment and Rule 31(a) afford Edlind the right

to a unanimous jury verdict. See Fed. R. Crim. P. 31(a) (noting that a jury verdict must be

unanimous); United States v. Sarihifard, 155 F.3d 301, 310 (4th Cir. 1998) ("[T]he Sixth

Amendment guarantees that the jury's findings of guilt be unanimous."). At least two courts

of appeals have required a special unanimity instruction when a defendant requests one at

trial. See United States v. Fawley, 137 F.3d 458, 470–72 (7th Cir. 1998); United States v.

Holley, 942 F.2d 916, 925–29 (5th Cir. 1991). On the other hand, "the law is less clear than

56

it might be as to when juror unanimity is required in the face of alternative paths to a verdict." United States v. Pagan-Santini, 451 F.3d 258, 267 (1st Cir. 2006). While the Fourth Circuit has suggested that a special unanimity instruction may be necessary "in order to prevent confusion," Sarihifard, 155 F.3d at 310, Edlind cites no case holding that such an instruction is required when multiple false statements are alleged in a single perjury count. Moreover, the Fourth Circuit held in 2002 that a district court did not commit plain error when it failed to include a special unanimity instruction, even though the defendant was accused of making multiple false statements in a single count under 18 U.S.C. § 922(a)(6). United States v. Spencer, No. 02-4010, 2002 WL 31875545, at *2 (4th Cir. Dec. 27, 2002).

Accordingly, Edlind's claim of plain error rests on shaky ground. Edlind's failure to request a special unanimity instruction at trial and her failure to file a timely Rule 33 motion leave little hope of relief. Nevertheless, the court need not finally determine the merits of Edlind's objection. The government's evidence is insufficient to sustain a conviction for perjury, and Edlind's motion for acquittal on Count Four is therefore **GRANTED**.

### E. Count Five: Obstruction

Count Five alleges that Edlind's false statements before the grand jury also constitute obstruction of justice under 18 U.S.C. § 1503(a). However, the government rests its argument for obstruction on the same evidence of perjury cited in Count Four. For the reasons stated above, the government failed to offer adequate evidence that any of the six false statements alleged in Count Four were perjurious. Absent this evidence, the

57

government has no proof of obstruction.[14]  Thus, just as the government's evidence was insufficient to support a perjury conviction in Count Four, it also fails to support an obstruction conviction in Count Five.  Accordingly, Edlind's motion for acquittal on Count Five is **GRANTED**.

### III.

For the reasons set forth above, the court will **GRANT in part and DENY in part** defendants' motion for acquittal, ECF No. 113.  The defendants' convictions on Counts One, Two, and Three are affirmed.  Edlind's convictions on Counts Four and Five are vacated, and a judgment of acquittal will be entered on these counts.

Finally, Rule 29(d) of the Federal Rules of Criminal Procedure requires the court to make a conditional ruling on any motion for new trial when, as here, it enters a judgment of acquittal.  Defendants filed a joint motion for new trial, ECF No. 127, which the court has addressed in a separate memorandum opinion.  Because that joint motion for new trial is

---

[14] In its opposition brief, the government points for the first time to other parts of Edlind's grand jury testimony to support Count Five, citing Edlind's answers to questions probing her communications with Kang.  The relevant excerpts can be found in the grand jury transcript, Gov't Ex. 27, at 100–15, and was read into the record at trial.  12/18 Trial Tr. 50:15–56:24.  This testimony includes a halting series of questions about text messages and phone calls between Edlind and Kang, with Edlind confirming that she exchanged text messages and phone calls with Kang, but struggling to recall the number of messages, their content, when they were sent, and who initiated them.  Id.  The government claims Edlind "minimized her communications with Kang" and "misstated what she had instructed Kang" in this part of her testimony.  ECF No. 115, at 28.  In reality, it appears the government faults Edlind for not disclosing the full scope of her conversation with Kang during the March dinner at Edlind's home, and failing to disclose the text message Edlind sent to Kwiatkowski and Kang on June 6, 2015.  However, it does not appear Edlind was ever directly questioned about either of these events during her grand jury testimony.  Moreover, Edlind and the prosecutor often talked over one another and jumped without warning from specific questions about particular text messages to broader questions about all communications between Edlind and Kang.  Indeed, the prosecutor apologized at several points for asking "confusing" questions, and re-stated or corrected several questions mid-sentence.  The result is an awkward exchange that is difficult to follow.  To the extent Edlind was not fully forthcoming in this portion of her testimony, a reasonable juror would have no evidence to infer that this was due to anything other than confusion.

58

untimely and defendants fail to show excusable neglect for the filing delay, the court cannot consider it. Thus, no conditional ruling is possible under Rule 29(d).

An appropriate Order will be entered.

Entered: 09/13/2016

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge

59